CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

10/2/2025

LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 6:23-cr-00016 |
| | ) | |
| JENNIFER ADAMS | ) | |

### MEMORANDUM OPINION

On July 7, 2025, the court held the first part of Jennifer Adams's sentencing hearing. At that time, Adams was sentenced to 36 months' imprisonment on each of two counts of misprision under 18 U.S.C. § 4, to be served concurrently, followed by one year of supervised release. (*See* Judgment, Dkt. No. 91.) The court ordered restitution and found Medicare and Virginia Medicaid to be victims under the Mandatory Victim Restitution Act (MVRA), but it deferred its ruling on the amount of restitution pending further briefing and additional argument.

Following the government's submission of a supplemental brief (Dkt. No. 107) and a hearing held on September 23, 2025 (Dkt. No. 108), the court took the matter under advisement to determine the amount of restitution owed to the victims in this case—Medicare and Virginia Medicaid.

On October 1, 2025, the court held the final restitution hearing and ordered restitution in the amount of $3,385,321.75, to be imposed jointly and severally. The other persons responsible for loss amounts to Medicare and Virginia Medicaid as a result of the healthcare fraud are Duane Dixon (Case No. 6:21-cr-15), John Gregory Barnes (Case No. 6:23-cr-11), and L5 Medical Holdings, LLC (Case No. 6:23-cr-12), hereinafter collectively "co-defendants."[1]

---

[1] Barnes and LL5 have not yet been sentenced, but they both have agreed to be responsible for restitution in their plea agreements. So, their liability will be joint and several to the extent restitution is ordered.

The court summarized its reasoning at the hearing, but sets forth its detailed reasons for imposing that restitution amount in the discussion that follows.

## I.  BACKGROUND

Adams, former Chief Operating Officer of L5 Medical Holdings, LLC ("L5"), pled guilty to two counts of misprision under 18 U.S.C. § 4.  The charges stemmed from her knowledge and concealment of multiple criminal conspiracies at L5, including the illegal distribution of controlled substances—such as Suboxone, oxycodone, hydrocodone, and morphine—without a legitimate medical purpose, and widespread healthcare fraud involving fraudulent billing, improper use of DEA registration numbers, and unnecessary drug testing.  These offenses occurred between in or about December 2014 and February 2020 and affected vulnerable patients, insurers, and government healthcare programs including Medicare and Medicaid.  While Adams was not a medical provider, she had full knowledge of and enabled the criminal conduct through her management position at the company.

On July 7, 2025, the court sentenced Adams to 36 months' imprisonment on each count, to be served concurrently, followed by one year of supervised release.  Restitution was also ordered, but the court deferred the determination of the restitution amount until no later than 90 days after sentencing in accordance with 18 U.S.C. § 3664(d)(5).  (*See* Judgment.)

The government seeks restitution under the Mandatory Victim Restitution Act (MVRA) in the amount of $4,909,132.82.[2]  (Gov. Sent. Mem. 28–31, Dkt. No. 84.)  This amount is based on losses to Medicare and Virginia Medicaid and is divided into four categories:

---

[2]  In its sentencing memorandum, the government initially listed the total restitution amount as $4,909,105.82.  (Gov. Sent. Mem. 31.)  However, at the July 7, 2025 sentencing hearing, the government clarified that this figure contained a scrivener's error and that the correct amount is $4,909,132.82.

| Category | Description | Medicare | Medicaid | Total |
|:---:|:---|---:|---:|---:|
| 1 | Claims listing Dr. Dixon as provider for Woodlawn patients from early 2017 through August 12, 2019, despite his absence[3] | $80,757.92 | $81,356.17 | **$162,114.09** |
| 2 | G0483 (UDS confirmation test) claims across all providers through February 2020 under "bill-to-the-max" policy | $2,547,093.92 | $1,540,808.73 | **$4,087,902.65** |
| 3 | Claims listing Dr. Randall as provider from 2017 through February 2020—Randall absent from L5 and provided no legitimate services | $997,119.58 | $607,784.28 | **$1,604,903.86** |
| 4 | Claims listing Dr. Dixon as provider after August 31, 2019 (after leaving L5) | $207,251.26 | $214,822.93 | **$422,074.19** |

(*Id.* at 29–30.)  The government argues that the billing in Categories 1, 3, and 4 was wholly fraudulent and readily traceable from billing records, thereby supporting full restitution of those amounts.

In contrast, it acknowledged that Category 2 was overinclusive, as not all urine drug screen ("UDS") confirmation tests billed under this category were medically unnecessary.  (*Id.* at 30.)  To determine the extent of the fraud, the government conducted a statistical analysis of a random sample of 20 files, reviewed by a medical expert.  The analysis found that approximately 80% of the files either were not appropriate to bill for a UDS test at all or should have been billed at something lesser.  Recognizing that some improperly billed confirmation tests could have been billed for a lower-level test, the government applied a more conservative fraud rate of approximately two-thirds, rather than the full 80%.  (*Id.*)  Using the adjusted rate, the

---

[3] The government called Special Agent Robert Slease of the U.S. Department of Health and Human Services to testify regarding the figures presented in this chart.  He testified that the amounts in Category 1 covered the period from early 2017 through August 12, 2019.  While the fraudulent activity began prior to 2017, Agent Slease explained that it significantly intensified starting in 2017, particularly with respect to drug testing.  (Slease Test. 5:25–6:12, Dkt. No. 94.)

government calculated the Category 2 restitution amount to be $2,720,040.68.  This brings the

total requested restitution amount to:

| Description | Restitution Amount |
|---|---|
| Category 1 | $162,114.09 |
| Category 2 ($4,087,902.65 x ~2/3)[4] | $2,720,040.68 |
| Category 3 | $1,604,903.86 |
| Category 4 | $422,074.19 |
| **Total** | **$4,909,132.82** |

At the July 7, 2025 sentencing hearing, Special Agent Robert Slease, from the U.S.

Department of Health and Human Services, testified regarding the source and reliability of these

restitution figures.  At the follow-up restitution hearing on September 23, 2025, Seth Peltier, an

investigator with the Virginia Attorney General's Office and the Medicaid Fraud Control Unit,

provided further testimony in support of the government's analysis.  Their testimony is

incorporated into the discussion below.

Adams raises several objections to the restitution amount, challenging both the scope and

calculation of the losses.  First, she argues that her liability should be limited to the conduct

charged in Count Two, Subpart (b)—the sole offense to which she pled guilty that is subject to

restitution.  Second, she contends that any restitution must be confined to losses directly caused

by her conduct between October 23, 2019, and February 2020.  Third, she argues that, if the

court finds that restitution is permitted, she should be held responsible only for a minimal,

proportionate share of any losses, rather than jointly and severally liable with co-defendants.

Fourth, she disputes the inclusion of managed care organizations ("MCO") as victims entitled to

restitution under the MVRA.  Fifth and finally, she challenges the methodology used to calculate

---

[4] At the July 7, 2025 sentencing hearing, the government explained that the applied percentage was not exactly two-thirds.  While it was unclear why the figure did not precisely equal two-thirds, the government stated that it had adopted the same percentage used in calculating restitution for Mr. Barnes.  (Sent. Tr. 47:4–48:9.)  The amount is 66.5387832 percent.

the losses in Category Two, arguing that the government had not sufficiently proven the validity

of the two-thirds fraud rate it applied to the UDS testing claims.[5]  These objections are addressed

in the discussion section below.

## II.  LEGAL STANDARD

The MVRA requires defendants convicted of fraud under Title 18 to pay their victims

restitution.  18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).  The MVRA describes a "victim" as "a

person directly and proximately harmed as a result of the commission of an offense for which

restitution may be ordered . . . ."  *Id.* § 3663A(a)(2).  An order of restitution under the MVRA is

issued and enforced in accordance with 18 U.S.C. § 3664, which sets forth the procedures for

calculating and ordering restitution.  *Id.* § 3663A(d).  Section 3664(f)(1)(A) provides that "the

court shall order restitution to each victim in the full amount of each victim's losses as

determined by the court and without consideration of the economic circumstances of the

defendant."  In cases involving multiple defendants, "the court may make each defendant liable

for payment of the full amount of restitution or may apportion liability among the defendants to

reflect the level of contribution to the victim's loss and economic circumstances of each

defendant."  *Id.* § 3664(h)  "The government bears 'the burden of demonstrating the amount of

the loss sustained by a victim by a preponderance of the evidence."  *United States v. Johnson*,

680 F. App'x 194, 200 (4th Cir. 2017) (citing § 3664(e)).  "Any dispute as to the proper amount

or type of restitution shall be resolved by the court."  18 U.S.C. § 3664(e).

---

[5]  Adams initially raised two additional objections related to restitution, but those objections have since
been resolved.  First, she argued that the United States had waived its statutory right to seek restitution.  (Def. Sent.
Mem. 9–10, Dkt. No. 83.)  However, she formally withdrew that objection at the sentencing hearing on July 7, 2025.
(*See* Sent. Tr. 26:21–25; 45:12–15, Dkt. No. 103.)  Second, Adams objected to the classification of Medicare and
Virginia Medicaid as "victims" under the Mandatory Victim Restitution Act (MVRA).  The court overruled this
objection, finding that both entities qualify as victims within the meaning of the MVRA, consistent with established
circuit authority.  (Sent. Tr. 43:25–45:7.)

III. DISCUSSION

The court begins by addressing the threshold objections concerning the scope of restitution, specifically Adams's first and second objections. These relate to whether restitution may be ordered at all and, if so, the extent to which Adams may be held liable based on the nature and timing of her conduct. Only after resolving those questions does the court turn to the remaining three objections, which challenge the amount of restitution sought and the methodology used in its calculation.

**A. Scope of Restitution**

**1. Restitution is limited to Count Two, Subsection (b) of the Information**

The presentence investigation report ("PSR") notes that the MVRA applies to the Title 18 offense in this case. (PSR ¶ 192, Dkt. No. 81.) Adams argues that any restitution award should be limited to actual losses directly and proximately caused by the conduct charged in Subsection (b) of Count Two of the Information—the only charge involving healthcare fraud under Title 18. (Def. Sent. Mem. 11–12.) She acknowledges that the PSR subtly recognizes this limitation and appears to seek confirmation that restitution liability applies solely to that subsection. (*Id.*)

The court agrees with both the PSR and Adams: restitution is limited to the conduct described in Subsection (b) of Count Two of the Information, which states: "Between in or about December 2014 and February 2020, in the Western District of Virginia and elsewhere, JENNIFER ADAMS, having knowledge of the actual commission of the following felonies cognizable by a court of the United States, concealed and did not as soon as possible make those felonies known to some judge or other person in civil or military authority under the United States . . . Conspiracy to commit healthcare fraud, in violation of 18 U.S.C. §§ 1347, 1349 . . . in violation of Title 18, United States Code, Section 4. " (Information 2, Dkt. No. 58.)

6

## 2. Restitution timeframe

Adams next argues that her restitution liability under the MVRA is limited to losses directly and proximately caused by her offense of misprision of felony, and only during the specific timeframe of October 23, 2019, to February 2020—the timeframe established by the Information and the Agreed Statement of Facts (Agreed Stmt. Facts, Dkt. No. 63). She asserts that although she had knowledge of the broader healthcare fraud scheme prior to October 2019, her only affirmative act of concealment occurred on October 23, 2019, when she made false statements during an interview with federal investigators. As such, she contends she cannot be held responsible for losses incurred outside that specific period. In support, she cites *United States v. Squirrel*, 588 F.3d 207 (4th Cir. 2009), and *United States v. Adams*, 363 F.3d 363 (5th Cir. 2004), to argue that the government may not rely on her plea agreement to expand her restitution obligation beyond what the MVRA permits.

However, neither *Adams* nor *Squirrel* supports limiting restitution under the facts of this case. In *Adams*, the Fifth Circuit vacated a restitution order that exceeded the scope of the fraudulent scheme to which the defendant had pleaded guilty. 363 F.3d at 364. There, the defendant was indicted in a conspiracy involving 14 staged car accidents, but pled guilty only to two specific incidents. Because the plea and sentencing records demonstrated that the defendant did not admit to the broader conspiracy, restitution could not lawfully include losses stemming from it. The court emphasized that under the MVRA, when a conviction arises from a guilty plea, the scope of relevant conduct for restitution purposes is defined by the parties' mutual understanding as reflected in the plea agreement, the factual basis, and the plea hearing. *Id.* at 367.

By contrast, in this case, Adams admitted to an ongoing course of conduct integral to the healthcare fraud scheme—well beyond a single false statement on October 23, 2019. She pleaded guilty to misprision of healthcare fraud having knowledge of that fraud between in or about December 2014 and February 2020 and concealing the same. The elements of misprision of healthcare fraud are that: 1) the healthcare fraud felony was committed; 2) Adams had actual knowledge of that felony; 3) Adams failed to notify a federal authority; and 4) Adams took an affirmative step to conceal the felony. 18 U.S.C. § 4. Adams's offense involved all of the requested restitution categories: 1) claims listing Dixon as a provider for Woodlawn patients from early 2017 through August 12, 2019; 2) urine drug testing (USD G0483 code) through February 2020 under the bill to the max policy; 3) claims listing Dr. Randall as the provider from 2017 through February 2020; and 4) claims listing Dixon as a provider after August 31, 2019.

The PSR, adopted by the court, and Agreed Statement of Facts go beyond passive knowledge—they document Adams's active participation in the fraud scheme. (*See* PSR ¶¶ 37–47; *see generally* Agreed Stmt. Facts.) Adams played a key role in directing and enforcing fraudulent and unethical practices at L5 related to the UDS testing and billing. (*See* PSR ¶¶ 37–47.) She instructed providers to classify nearly all patients as "high risk" to justify billing for more frequent and expensive UDS testing. (*Id.* ¶ 41.) Adams promoted and enforced policies that based testing decisions solely on insurance reimbursement potential, rather than clinical need. (*Id.* ¶ 42.) She sent emails directing staff to test patients based on their insurance limits and pushed for the use of more expensive confirmation tests when allowed. Additionally, Adams knew about and facilitated billing manipulation. For example, in November 2017, she specifically directed that out-of-network services at the Woodlawn clinic be billed under in-network providers. (*Id.* ¶ 44.) She also knowingly allowed L5 staff to falsely designate Dr.

Randall as the treating or supervising physician, despite his lack of genuine involvement, to create the appearance of regulatory compliance. (*Id.* ¶ 46.) Adams was aware that Dr. Randall was rarely onsite at the Woodlawn clinic (*id.* ¶ 15) and that Dr. Dixon was not present there either (*id.* ¶¶ 14, 44). These were not isolated or after-the-fact actions—they were ongoing managerial decisions and deliberate efforts to conceal the fraud and sustain its financial benefits.

*Squirrel* is similarly inapposite. There, the Fourth Circuit vacated restitution orders against two defendants who pleaded guilty to being accessories-after-the-fact to a murder. Because their conduct—disposing of a weapon and obstructing justice—occurred after the victim's death, the court held that their actions did not directly or proximately cause the financial losses to the victim's estate. *Squirrel*, 588 F.3d at 216. In contrast, Adams's conduct directly facilitated the ongoing commission of fraud and the resulting harm to victims. Unlike in *Squirrel*, where the harm had already occurred, Adams's role was not after-the-fact—she was actively involved in real-time. Her management activities and false representations furthered the fraudulent operation and masked its illegitimacy, making her a direct contributor to the victims' losses. These are the facts to which Adams pleaded guilty, and the facts upon which her misprision charge is based in Subsection (b) of Count Two of the Information.

To the extent Adams relies on *Squirrel* for the proposition that her plea agreement cannot expand her exposure to restitution beyond the limits of the MVRA, the court agrees with that general proposition. In *Squirrel*, the Fourth Circuit addressed plea agreements that broadly obligated the defendants to pay restitution for all victims harmed by their "relevant conduct" as defined under U.S.S.G. § 1B1.3, which includes conduct related to dismissed or uncharged offenses. Despite this broad language, the court held that such plea agreements cannot override the core requirement of the MVRA that restitution must be tied to losses directly and

proximately caused by the defendant's conduct. *Squirrel*, 588 F.3d at 218 ("The one distinction between the MVRA and the restitution provided in the plea agreements is that the MVRA does not permit reliance on a defendant's relevant conduct for purposes of a causation analysis."). Because the defendants' actions in *Squirrel* occurred only after the victim's death and did not directly cause the financial losses to the victim's estate, the plea agreements could not expand their restitution liability to cover those losses.[6] *Id.*

However, that case is materially different. Unlike the defendants in *Squirrel*, Adams's admitted conduct was an ongoing, active part of the fraudulent scheme—facilitating illegal billing practices, directing staff to misrepresent provider roles and patient risk levels, manipulating claims to maximize insurance reimbursement, and taking deliberate steps to conceal the scheme and sustain its financial benefits. The losses to the government flowed directly from this continuous, knowing participation. Thus, the restitution provision in Adams's plea agreement aligns with the MVRA's requirement of a causal nexus between her conduct and the losses. Here, Adams's plea agreement does not merely encompass "relevant conduct" in a technical sense but reflects offense conduct and a factual admission that her actions themselves directly caused the losses for which restitution is ordered. Consequently, the *Squirrel* holding does not apply to limit restitution in Adams's case, and her plea agreement supports the scope of restitution under the MVRA.

Nonetheless, Adams contends that her restitution liability under the MVRA must be narrowly confined to losses incurred only between October 23, 2019, and February 2020. She first points to the Information, which identifies February 2020 as the endpoint of the conduct

---

[6] The *Squirrel* court acknowledged that "the MVRA permits a plea agreement to broaden the scope of a defendant's conduct which would subject him to an order of restitution," citing 18 U.S.C. § 3663A(a)(3), which provides that a district court must "order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." *Squirrel*, 588 F.3d at 217. However, the plea agreements in *Squirrel* did not do so.

underlying her misprision charge.  Second, she relies on the Agreed Statement of Facts, which states that her only affirmative act of concealment occurred on October 23, 2019, when she made false statements to federal agents.  According to Adams, although she knew about the healthcare fraud conspiracy before that date, she did not actively conceal it until the October interview and therefore contends that she cannot be held responsible for any victim losses that occurred before or after the narrow four-month window.  (Def. Sent. Mem. 12.)

However, this argument fails to account for the broader scope of conduct to which Adams admitted.  While Adams attempts to limit her liability to a single act on a specific date, both the factual record and circuit precedent make clear that her misprision offense involved an ongoing course of conduct that furthered the underlying healthcare fraud.  In *United States v. Borino*, 123 F.4th 233, 263 (5th Cir. 2024), the Fifth Circuit held that when a defendant's concealment allows a fraudulent scheme to continue, restitution under the MVRA may extend beyond the specific concealment acts listed in the factual basis—so long as the losses were directly and proximately caused by the defendant's ongoing concealment.  In *Borino*, the defendant pled guilty to misprision of wire fraud and challenged a $21.5 million restitution order, arguing that his liability should be limited to three conversations mentioned in the factual basis. *Id.* at 255.  The court rejected that argument, finding that the charging documents and the factual basis underlying Borino's guilty plea alleged a multi-year concealment, during which his continued silence allowed the fraud to continue.  *Id.* at 255–56.

The Fifth Circuit analogized Borino's case to those in *United States v. Marino*, 654 F.3d 310 (2d Cir. 2011), and *United States v. Sosebee*, 419 F.3d 451 (6th Cir. 2005), where circuit courts of appeals upheld full restitution orders for defendants convicted of misprision when their ongoing concealment allowed fraudulent schemes to continue.  The Borino court affirmed the

11

district court's restitution order, concluding that "but for his continuing concealment, significant losses might have been avoided altogether or at least stemmed to a significant degree." *Borino*, 123 F.4th at 263. Notably, the Bill of Information in *Borino* alleged a specific timeframe of knowing concealment—"not later than in or about September 2014, and continuing through at least on or about January 10, 2017." Likewise, Adams's Bill of Information alleges that between December 2014 and February 2020, she knew of the healthcare fraud conspiracy and "concealed and did not as soon as possible make those felonies known" to the appropriate authorities. (Information 2.)

The Fifth Circuit also emphasized that in misprision cases, courts may consider the scope of the underlying felony in assessing restitution. *Borino*, 123 F.4th at 263. In *Borino*, the concealed offense was wire fraud and the structure of the fraudulent program was properly considered in the district court's restitution analysis. Similarly, the offense concealed by Adams was health care fraud, which is likewise a scheme-based crime involving a prolonged course of deceptive conduct. For these reasons, the court finds that Adams's restitution liability is not limited to the specific date of her direct concealment. Instead, consistent with *Borino*, the court will consider the entirety of the fraudulent scheme from December 2014 through February 2020 in determining the restitution amount. Accordingly, Adams's objection is overruled.

**B. Amount of Restitution**

Having concluded that restitution is appropriate under the MVRA and that Adams's liability encompasses the full duration of the fraudulent scheme, as outlined in the Information to which Adams pleaded guilty—from December 2014 through February 2020—the court now turns to the specific objections raised regarding the amount of restitution sought by the government. Adams challenges both the inclusion of certain categories of victims—namely, the

MCOs—and the methodology used to calculate the losses, particularly in relation to the government's application of a two-thirds fraud rate to UDS confirmation tests. She also asserts that her role in the offense was comparatively minor and that restitution should reflect a proportionate share rather than joint and several liability with the other defendants. The court addresses each of these arguments in turn.

### 1. Managed care organizations

Adams argues that the government improperly commingles MCO payments with Medicaid payments. She contends that she should not be required to pay restitution for any claim amounts paid by MCOs, as the government has not identified those entities as victims under the MVRA. In response, the government asserts that payments made by MCOs are properly included in the total loss to Medicaid. (Dkt. No. 107.)

Under the MVRA, a victim is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

At the outset, the court notes the lack of any legal authority on this issue—specifically, whether losses sustained by Medicaid encompass payments made by MCOs for purposes of restitution under the MVRA.[7] This is a novel issue raised by Adams that warrants careful

---

[7] The court is aware of at least one case in which an MCO was involved in the administration of Medicare and Medicaid claims, yet restitution was awarded solely to Medicare and Medicaid. *See United States v. Pincus*, No. 23-6597-CR, 2024 WL 4645686, at *1 (2d Cir. Nov. 1, 2024) (affirming district court's restitution order to Medicare and Medicaid based on health care fraud involving false claims submitted through an MCO administering those programs). However, that case did not address the issue presented here, and the Second Circuit offered no meaningful guidance on how MCOs should be treated under the MVRA in the Medicaid context. Moreover, that case arose in New York, a state that may administer its Medicaid program differently from Virginia.

consideration, particularly given the significant portion of claims at issue that involve MCO

payments.  As Investigator Peltier testified during the September 23, 2025 hearing, the chart

below reflects the scale of these claims:

| Category | Description | MCO Payments | Medicaid Direct Payments | Total |
|---|---|---|---|---|
| 1 | Claims listing Dr. Dixon as provider for Woodlawn patients from early 2017 through August 12, 2019, despite his absence | $77,459.03 | $3,897.14 | **$81,356.17** |
| 2 | G0483 (UDS confirmation test) claims across all providers through February 2020 under "bill-to-the-max" policy[8] | $639,370.40 | $385,872.93 | **$1,025,243.33** |
| 3 | Claims listing Dr. Randall as provider from 2017 through February 2020—Randall absent from L5 and provided no legitimate services | $595,719.20 | $12,065.08 | **$607,784.28** |
| 4 | Claims listing Dr. Dixon as provider after August 31, 2019 (after leaving L5) | $211,262.44 | $3,560.49 | **$214,822.93** |
| **Total** | | **$1,523,811.07** | **$405,395.64** | **$1,929,206.71** |

The relationship between Virginia Medicaid and MCOs adds a layer of complexity to the

restitution analysis in this case.  Virginia Medicaid is administered by the Virginia Department

of Medical Assistance Services ("DMAS"), which contracts with MCOs to manage the care of

Medicaid recipients.  DMAS pays these MCOs a fixed capitation rate for each enrolled patient,

regardless of the actual amount of care provided.  According to the testimony of Investigator

Peltier, this capitation rate is adjusted monthly, based on the claims associated with a particular

recipient.

---

[8]  The numbers for Category 2 reflect the application of the approximately two-thirds adjusted rate to the underlying amounts, discussed *supra*.

Both Agent Slease and Investigator Peltier testified about the structure and mechanics of this arrangement.  Agent Slease confirmed that under Virginia's managed care model, it is the MCO—not DMAS—that pays healthcare providers directly for services, if a particular patient is managed by an MCO.  He acknowledged that when entities like L5 submit claims, it is the MCO that issues payment and does not seek reimbursement from DMAS for those individual claims, as that is supposed to be captured in the capitation rate.  While he emphasized that the ultimate financial burden falls on taxpayers who fund Medicaid, he agreed that at the transactional level, the MCO is the entity making the payments and thus is the direct payor.  However, Agent Slease conceded that he is not an expert on Medicaid or MCO operations.  (*See* Slease Test. 14:20–18:4.)

Investigator Peltier, affiliated with the Virginia Attorney General's Office and the Medicaid Fraud Control Unit, had greater familiarity with the Medicaid program but offered limited additional clarity.  He largely echoed Agent Slease's testimony, explaining that MCOs are paid fixed capitation amounts from DMAS.  In the event that a recipient does not receive medical care that amounts to the capitation rate, the MCO gets to retain unused funds as profit. He testified that L5 submitted claims for over 2,000 Medicaid recipients, but noted that determining how those claims affected capitation payments would require a complex, case-by-case analysis that could take years.  Peltier also testified that even when fraud goes undetected, the Medicaid program ultimately absorbs the financial impact because fraudulent or excessive billing can influence adjustments to future capitation rates.  However, he too admitted that he was not an expert in this area.  Nevertheless, while acknowledging that MCOs may experience losses, he characterized them primarily as subcontracted entities operating under the umbrella of the Medicaid program, rather than as direct victims in their own right.

To be clear, the court agrees that the ultimate victim of the healthcare fraud in this case is the taxpayer, whose funds support DMAS.  DMAS uses those funds to pay MCOs a capitation rate to manage the care of Medicaid recipients.  Testimony presented indicates that these capitation rates are periodically adjusted—possibly monthly—based on the volume and nature of claims submitted for individual patients.  However, neither of the government's witnesses could explain with specificity how or to what extent the fraudulent claims actually influenced those adjustments.  Thus, although it is possible that L5's fraudulent billing affected capitation rates paid by DMAS to the MCOs, the government has not proven this by a preponderance of the evidence.  Nor is there any evidence in the record quantifying the financial impact of such adjustments, if any.

As discussed above, under the MVRA, the government bears the burden of proving—by a preponderance of the evidence—the identity of the person or entity "directly and proximately harmed as a result of the commission of an offense."  The Supreme Court has emphasized a narrow reading of the MVRA.  *See Lagos v. United States*, 584 U.S. 577, 583 (2018) ("To interpret the [MVRA] broadly is to invite controversy on those and other matters; our narrower construction avoids it.").  While Medicaid may be an indirect victim—and taxpayers the ultimate ones—the government has not shown that Medicaid was directly and proximately harmed by the claims paid by the MCOs.

Although it may be that MCOs themselves were directly and proximately harmed by the payments they made to L5, the court need not make that determination.  It is enough to conclude that the government has not shown—by a preponderance of the evidence—that Medicaid was directly and proximately harmed with respect to those payments.  Accordingly, the government

has failed to identify a proper victim under the MVRA for the MCO-paid claims.[9]  The court will

therefore sustain Adams's objection and exclude those amounts from the restitution order.  The

chart below reflects the exclusion of MCO-paid claims and the final restitution calculation.

| Category | Description | Medicare Payments | Medicaid Direct Payments | Total |
|---|---|---|---|---|
| 1 | Claims listing Dr. Dixon as provider for Woodlawn patients from early 2017 through August 12, 2019, despite his absence | $80,757.92 | $3,897.14 | $84,655.06 |
| 2 | G0483 (UDS confirmation test) claims across all providers through February 2020 under "bill-to-the-max" policy[10] | $1,694,797.35 | $385,872.93 | $2,080,670.28 |
| 3 | Claims listing Dr. Randall as provider from 2017 through February 2020—Randall absent from L5 and provided no legitimate services | $997,119.58 | $12,065.08 | $1,009,184.66 |
| 4 | Claims listing Dr. Dixon as provider after August 31, 2019 (after leaving L5) | $207,251.26 | $3,560.49 | $210,811.75 |
| Total | | $2,979,926.11 | $405,395.64 | $3,385,321.75 |

---

[9]  The government also cites § 19.4 of the standard contract between DMAS and the MCOs, which provides that "any recovery, in whole or in part, or penalty recovered through the investigative efforts or litigation by the MFCU [Medicaid Fraud Control Unit] related to fraudulent provider conduct will be returned to the Commonwealth of Virginia and remain in the possession of the Commonwealth of Virginia."  (Dkt. No. 107-1, 2.)  Because the L5 healthcare fraud scheme was investigated by the Virginia MFCU, the government argues that restitution is properly awarded to Virginia Medicaid.  Adams, however, highlights § 19.3 of the same contract, which states that the MCO "must be permitted to retain recoveries of overpayments identified through their own monitoring and investigative efforts."  (Dkt. No. 107-1, 1.)  She argues that this undermines the government's position that Medicaid alone is the victim.  In any event, Adams contends, the MVRA governs who qualifies as a victim for restitution purposes, and the statutory standard—not the contract—controls.  The government acknowledged as much at the September 23, 2025 hearing, but argued that the contract nonetheless provides relevant context as to who the true victim is.

The court agrees that the parties cannot contract around the requirements of the MVRA.  While § 19.4 may become relevant if restitution were ordered directly to an MCO—potentially obligating the MCO to remit those funds to the Commonwealth of Virginia—that scenario is not before the court.  Notably, the MCOs have not sought restitution in this case.  The court must apply the statute as written.  Under the MVRA, the government bears the burden of establishing, by a preponderance of the evidence, the identity of the victim "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  18 U.S.C. § 3663A(a)(2).  Here, the government has not met that burden.  It has failed to show that Medicaid, rather than the MCOs, was the direct victim with respect to the MCO claims at issue.

[10]  The numbers for Category 2 reflect the application of the approximately two-thirds adjusted rate to the underlying amounts, discussed *supra*.

**2. Two-thirds fraud rate applied to UDS confirmation tests**

Adams argues that the government has not met its burden of proving—by a preponderance of the evidence—that the approximately two-thirds fraud rate applied to the UDS confirmation tests is accurate. While she acknowledges that some reduction is appropriate, she contends that the government failed to introduce sufficient evidence to justify this specific percentage. In particular, Adams notes that neither of the government's witnesses could identify the expert who conducted the underlying statistical analysis, nor could they explain the methodology used to arrive at the two-thirds figure.

"The MVRA requires courts to order restitution 'in the full amount of the victim's loss caused by certain federal offenses.'" *United States v. Manlapaz*, 825 F.App'x 109, 118 (4th Cir. 2020) (citing *United States v. Ritchie*, 858 F.3d 201, 207 (4th Cir. 2017). "To obtain restitution under the MVRA, the Government [is] required to establish the actual loss amount by a preponderance of the evidence, at which point 'the burden shift[s] to the defendant to dispute th[at] amount with [his] own evidence.'" *Id.* (citing *United States v. Stone*, 866 F.3d 219, 227 (4th Cir. 2017)). The MVRA "does not require absolute precision so long as there is a basis for reasonable approximation." *Id.* (internal citations omitted). "Any dispute as to the proper amount or type of restitution shall be resolved by the court." 18 U.S.C. § 3664(e).

The court begins by summarizing the Agreed Statement of Facts as it pertains to the UDS testing scheme implemented at L5 under the direction of Adams and her co-defendant, Mr. Gregory Barnes. L5 operated its own laboratory, not to better serve patients, but to bill insurers directly for drug testing—often processing samples that had been improperly stored for weeks or months and were no longer clinically useful. Despite concerns from providers about the lack of random and medically appropriate testing—standard in addiction treatment—Barnes and Adams

resisted changes that might reduce revenue.  Instead, they created and enforced a policy that

dictated the frequency and type of testing based solely on what insurance would reimburse.

Patients were uniformly labeled as "high risk" to justify more frequent and expensive tests, and

providers were pressured to comply with this model, regardless of clinical need.  (*See generally*

Agreed Stmt. Facts 7–9.)

The PSR, adopted by the court, also shows that Adams played a central role, directing

staff to prioritize billing over care and criticizing those who failed to meet aggressive revenue-

driven targets.  The entire UDS program was a fraudulent scheme designed not for treatment, but

for profit, and it systematically exploited patients and insurers alike.  (*See* discussion *supra*,

Section III.A.2; PSR ¶¶ 37–47.)

This fraudulent scheme continued for years and involved thousands of patients.

Investigator Peltier testified that, based on Medicaid billing data alone, over 2,000 Medicaid

patients were seen at L5—a figure that excludes Medicare patients.  To estimate the extent of the

fraud related to UDS testing, the government stated in its sentencing memorandum that an expert

had reviewed a random sample of 20 patient files.  That review concluded that approximately

80% of the claims were either entirely unjustified or should have been billed at a lower rate.[11]

(*See* Gov. Sent. Mem. 30.)  Although the expert was not identified at the hearing and the details

of the analysis were not disclosed, this finding was supported by the sworn testimony of Agent

Selase from the U.S. Department of Health and Human Services and Investigator Peltier from the

Virginia Attorney General's Office.  Both confirmed that the vast majority of UDS testing claims

were either medically unnecessary or improperly upcoded.

---

[11]  The court notes that Adams did not challenge either the number of files reviewed or the general use of
statistical sampling in estimating the fraud rate.  Instead, her objections focus on the lack of detail regarding the
medical expert who conducted the file review.

The government acknowledged that some testing may have been justified, albeit at a lower billing level, and conservatively applied a two-thirds fraud rate to the UDS confirmation claims.  Notably, this reduction is generous in that it does not account for the backlog of urine samples that accumulated over weeks or months due to testing machine breakdowns.  Although many of these samples were no longer valid, L5 nonetheless required them to be tested to facilitate insurance billing.  (Agreed Stmt. of Facts ¶ 28.)  While the defense emphasized the absence of a named expert and detailed methodology, the court finds that the two-thirds figure represents a reasonable approximation, particularly in light of the pervasive and systematic nature of the fraudulent conduct.  The Fourth Circuit has made clear that restitution under the MVRA may be based on a "reasonable approximation" and that courts need not require absolute precision in calculating the amount of loss.  *See Manlapaz*, 825 F. App'x at 118 (citing *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012) (recognizing that a restitution amount need not "be proven with exactitude" and "determining the dollar amount of a victim's losses attributable to the defendant will often be difficult and . . . will inevitably involve some degree of approximation, which is not fatal")).

Accordingly, the court finds that the government has established the actual loss amount attributable to the UDS confirmation tests by a preponderance of the evidence.  Adams has failed to present any rebuttal evidence to dispute this estimate.  While she critiques the government's failure to disclose the identity of the expert or explain their methodology in detail, she has not introduced any competing evidence to support a different fraud rate.  Indeed, during the September 23, 2025 hearing, Adams effectively conceded that a reduction in billed amounts was warranted.  Based on the record—including the Agreed Statement of Facts and the corroborating testimony of Agent Selase and Investigator Peltier—the court concludes that the government's

two-thirds fraud rate constitutes sufficient approximation under the MVRA. Accordingly, Adams's objection is overruled.

### 3. Proportionate liability, not joint and several

Lastly, Adams argues that if the court imposes restitution, it should do so in accordance with 18 U.S.C. § 3664(h), which allows apportioning liability among multiple defendants based on their individual contributions to the loss and their economic circumstances.[12] (Def. Sent. Mem. 13–14.) Conversely, the government requests that restitution be imposed on a joint and several basis with the co-defendants.

Section 3664 provides that "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). However, if more than one defendant has contributed to a victim's loss, "the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." *Id.* § 3664(h).

Here, the record overwhelmingly demonstrates that Adams was not a peripheral or unwitting participant. Rather, she played a central and indispensable role in implementing and

---

[12] Adams also argues that the court should consider the forfeiture provisions in her plea agreement, as well as those of her co-defendants, when determining restitution, and that any restitution order should reflect the proportionate forfeiture amounts. However, the Fourth Circuit has made clear that restitution and forfeiture serve distinct purposes: "restitution functions to compensate the victim, whereas forfeiture acts to punish the wrongdoer." *United States v. Bennett*, 986 F.3d 389, 398 (4th Cir. 2021) (citing *United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014)). As noted above, 18 U.S.C. § 3664(f)(1)(A) mandates that "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and *without consideration* of the economic circumstances of the defendant." (emphasis added.) Although § 3664(h) permits a court to apportion restitution among multiple defendants based on their relative contribution to the victim's loss and their economic circumstances, it does not require apportionment. Given the distinct legal purposes of forfeiture and restitution, and in light of Adams's central role in perpetrating the healthcare fraud scheme, the court rejects her argument. It will not consider the forfeiture amounts imposed on Adams or her co-defendants when determining the appropriate restitution.

directing the very practices that gave rise to the fraud.  She helped enforce the fraudulent billing schemes across multiple L5 clinics, directed staff to submit claims using unauthorized provider identities and DEA numbers, and knowingly supported practices that led to widespread, systemic submission of false claims to Virginia Medicaid and Medicare.  These were not isolated or siloed acts—they were interconnected elements of a unified and coordinated scheme to defraud.

As the Fourth Circuit has emphasized, "the primary purpose of the MVRA [is] to ensure that victims are made whole."  *United States v. Steele*, 897 F.3d 606, 611 (4th Cir. 2018) (citing *United States v. Grant*, 715 F.3d 552, 558 (4th Cir. 2013)).  While the MVRA "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole[,] . . . just as the victim is not entitled to a windfall, the defendant is not entitled to a bailout."  *Stone*, 866 F.3d at 226 (citing *United States v. Ritchie*, 858 F.3d 201, 216 (4th Cir. 2017)).

Given the scope of the fraud, the collective nature of the scheme, and Adams's central role in executing and sustaining it, the court finds apportioning restitution is neither appropriate nor consistent with the purposes of the MVRA.  Joint and several liability is therefore necessary and warranted to best effectuate the MVRA's core purpose of making victims whole, and to maximize the likelihood that Virginia Medicaid and Medicare will be fully compensated.  Accordingly, the court orders the restitution amount on joint and several basis with the co-defendants.

IV.  CONCLUSION

For the foregoing reasons, at the restitution hearing held on October 1, 2025, the court ordered Adams jointly and severally liable for restitution in the total amount of $3,385,321.75. This amount was allocated between Medicare (Name of Payee—Centers for Medicare and Medicaid Services) and Virginia Medicaid in the amounts of $2,979,926.11 and $405,395.64, respectively, in accordance with the MVRA, 18 U.S.C. § 3663A.  Payment of any post-judgment interest on restitution was waived.

Additionally, the MVRA "require[s] the court to set a payment schedule "in consideration of—(A) the financial resources and other assets of the defendant, including whether any of the assets are jointly controlled; (B) projected earnings and other income of the defendant; and (C) any financial obligations of the defendant; including obligations to dependents." *United States v. Leftwich*, 628 F.3d 665, 668 (4th Cir. 2010) (citing 18 U.S.C. § 3664(f)(2)).  The Fourth Circuit "has interpreted this provision as requiring the district court to make factual findings keying the payment schedule to these factors and demonstrating the feasibility of the schedule." *Id.* (citing *United States v. Dawkins*, 202 F.3d 711, 717 (4th Cir. 2000)).

Here, the record reflects that Adams has significant outstanding debts, including over $60,000 owed to the Department of Education and over $40,000 to a private lender.  However, she currently maintains employment and earns approximately $70,000 annually as a restaurant manager.  Her current and former employers described her as dependable and hardworking. Although her financial condition precludes immediate full restitution, the court found that, given her age, work ethic, and demonstrated earning potential, she has the capacity to contribute meaningfully toward restitution over time.

23

Accordingly, the court ordered that, upon her release from the 36-month term of imprisonment, Adams shall pay restitution at a rate of $100 per month for 20 years, with payments commencing 60 days after her release.

The court will enter an amended judgment reflecting this restitution order, consistent with the findings in this memorandum opinion and the hearing held on October 1, 2025.

Entered: October 1, 2025.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge